UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| REVEREND JEROME STRONG,<br><br>    Plaintiff,<br><br>    vs.<br><br>MERRILL LYNCH,<br><br>    Defendant. | Case No: C 10-0031 SBA<br><br>**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**<br><br>Dkt. 38 |

In this action, Plaintiff Reverend Jerome Strong ("Plaintiff") brings claims against his former employer, Defendant Merrill Lynch ("Defendant" or "Merrill Lynch"), for race discrimination and race harassment under Title VII of the Civil Rights Act ("Title VII") and the California Fair Employment and Housing Act ("FEHA"). The parties are presently before the Court on Defendant's Motion for Summary Judgment, or in the Alternative Partial Summary Judgment. Dkt. 38. Having read and considered the papers filed in connection with this matter and being fully informed, the Court hereby GRANTS the motion for the reasons set forth below. The Court, in its discretion, finds this matter suitable for resolution without oral argument. See Fed.R.Civ.P. 78(b).

**I.    FACTUAL BACKGROUND**

   **A.    PLAINTIFF'S EMPLOYMENT**

In January 2008, Plaintiff began his employment as a Financial Advisor ("FA") trainee in Defendant's Paths of Achievement Program ("POA Program"). Dkt. 46, Rojas Decl., Ex. A (Pl. Dep. Tr.) 33:20-22; 34:17-22; Dkt. 41, Etheridge Decl. ¶ 3. Plaintiff was hired by Riley Etheridge, who at the time was Regional Managing Director for the Northern California Region. Rojas Decl., Ex. A 35:7-15; Etheridge Decl. ¶¶ 2, 3.

1    According to Defendant, the POA Program is a training program that seeks to cultivate
2 highly skilled professionals who are equipped to serve the needs of Defendant's diverse client
3 base. Etheridge Decl. ¶ 4. It is a structured program, with its components and production
4 requirements established by Defendant at a corporate level, not at a regional or office level.
5 Id.; Rojas Decl., Ex. A 34:21-35:6. As an FA trainee in the POA Program, after an eight week
6 ramp-up period, Plaintiff was to start producing in March 2008. Etheridge Decl. ¶ 6. Plaintiff
7 was also required to meet certain quarterly production targets that were set out in the POA
8 compensation guide ("POA Guide"). Id. ¶¶ 5-6; Dkt. 42, Ivins Decl. ¶¶ 13, 14; Rojas Decl.,
9 Ex. A 53:3-54:2. The POA Guide, which was referenced in Plaintiff's offer letter, was
10 available to Plaintiff on Defendant's intranet. Rojas Decl., Ex. A 49:3-50:12; 50:17-51:6;
11 163:11-164:2.

12    **B.    PLAINTIFF'S ATTEMPT TO PARTNER WITH ANOTHER FA**

13    After starting at Merrill Lynch, Plaintiff learned that a prospect he had been attempting
14 to cultivate while still working at his former firm was also being courted by a Merrill Lynch
15 FA, Joe Grimm, who is Caucasian. Rojas Decl., Ex. A 104:23-107:6. Plaintiff claims he
16 sought the assistance of then Sales Manager, Mike Ronan, regarding how to handle the
17 situation with the prospect, Kikkoman Corporation ("Kikkoman"). Id. Ronan allegedly talked
18 to both Plaintiff and Grimm and advised them to work together on a prospective deal and to
19 split the business 50/50 if the deal closed. Id. 107:7-108:10. In April 2008, Kikkoman's
20 representative informed Plaintiff that the company had decided to keep its business with its
21 current advisor, and no deal was completed with Merrill Lynch. Id. 117:12-125:7.

22    **C.    POVLITZ BECOMES THE NEW REGIONAL MANAGING DIRECTOR**

23    Around the same time, in March or April 2008, Jennifer Povlitz took over as Regional
24 Managing Director after Etheridge was transferred to a different position within Merrill Lynch.
25 Etheridge Decl. ¶ 9; Povlitz Decl. ¶ 2. With the exception of one private meeting with Povlitz
26 in May or June 2008, Plaintiff's interaction with her was limited to attending large office
27 meetings where she was present, and calling in to listen to weekly teleconferences concerning
28 business updates that she hosted. Povlitz Decl. ¶ 3; Rojas Decl., Ex. A 36:2-37:21. According

1  to Plaintiff, their sole one-on-one meeting consisted of Plaintiff inquiring about a possible firm
2  sponsorship for a trade group that he had founded, and Povlitz referred him to her supervisor,
3  whom Plaintiff later contacted. Rojas Decl., Ex. A 37:13-38:10. According to Plaintiff, the
4  exchange lasted only a couple of minutes and was "very professional." Id. 41:14-42:7.

        **D.**     **PLAINTIFF IS COUNSELED ABOUT THE USE OF RELIGIOUS LANGUAGE IN MAILINGS TO CLIENTS**

7         Defendant asserts that, as an investment firm, it is governed by strict compliance rules
8  concerning various aspects of its business, including prospecting and contacting clients. Dkt.
9  43, Mesinger Decl. ¶ 3. To ensure compliance, all outgoing correspondence is reviewed on a
10 regular basis by the Administrative Manager. Id. ¶ 4; Rojas Decl., Ex. A 91:17-23. As the
11 Regional Administrative Manager for the Oakland office (where Plaintiff worked), Joan
12 Mesinger routinely instructed FAs, including FA trainees, to modify their correspondence to
13 meet compliance standards. Mesinger Decl. ¶¶ 5-7.
14        In April 2008, soon after Plaintiff entered production mode, Mesinger contacted
15 Plaintiff regarding religious language he was inserting in a proposed mass mailing to local
16 churches as part of his prospecting efforts. Id. ¶ 7; Rojas Decl., Ex. A 90:5-24. Specifically,
17 the mailing stated: "I pray this letter finds you prospering in the things of our Lord …. My
18 model for business at Merrill is working with churches to better understand our role as
19 stewards of the seed from the giver …." Mesinger Decl. ¶ 7; Rojas Decl., Ex. A 64:3-16, Ex.
20 C. Mesinger felt this language was inappropriate for a business letter to prospective clients,
21 and was concerned that it could expose Defendant to claims that it used religion to entice
22 prospective clients to invest with the firm. Mesinger Decl. ¶ 8. Before she instructed Plaintiff
23 to discontinue use of such language on firm letterhead, Mesinger first consulted with
24 Defendant's compliance and marketing departments on the issue. Id. ¶ 9. Plaintiff testified
25 that Mesinger was professional in her discussions with him regarding this matter, and that their
26 relationship in general was "cordial." Rojas Decl., Ex. A 40:13-41:1; 101:10-20. Furthermore,
27 Plaintiff testified that when he questioned the basis for Mesinger's directive, she agreed that he
28 could use "whatever religious language" that he wished in client communications provided

they were handwritten on Merrill Lynch issued note paper, which displayed the firm's logo, and not typed on letterhead.  Id. 95:17-98:18.

### E. THE KIKKOMAN PROSPECT IS REVIVED

In September 2008, Plaintiff contacted Kikkoman's representative in an attempt to restart discussions about transferring Kikkoman's business to Merrill Lynch.  Rojas Decl., Ex. A 125:2-14; 128:10-129:23; 135:8-136:14.  Plaintiff claims that, at the time, he learned that Grimm had also been in touch with the Kikkoman representative since their last discussions had broken off.  Id.  In response, Plaintiff emailed Povlitz, alleging that Grimm had "underhandedly" attempted to make the proposal to Kikkoman without Plaintiff.  Id.  Povlitz asked Abigail Ivins, the then-current Regional Business Manager, to respond to Plaintiff's concern.  Povlitz Decl. ¶¶ 4-5; Ivins Decl. ¶ 3.

Ivins investigated the matter and concluded that Grimm had not acted underhandedly. Ivins Decl. ¶ 4.  Ivins determined that Plaintiff and Grimm should partner on the deal in accordance with the firm's standard teaming guidelines, known as the "Guide to Situational Teaming Opportunities" ("Teaming Guidelines").  Id. ¶ 5.  It was Ivins' standard practice to apply these written guidelines in situations where FAs partnered together to gain new business. Id.  Under these guidelines, if the deal closed, the business would be split 60/40, with 60% to the "Servicing Advisor" and 40% to the "Non-Servicing Advisor."  Id. ¶ 6.  After three years, the split would become 75/25.  Id.  Ivins communicated to Plaintiff that she had determined that he was the Non-Servicing Advisor, and thus would receive 40%.  Id. ¶ 7; Rojas Decl., Ex. A 136:12-141:8, Ex. D.  Plaintiff testified that, while he disagrees with Ivins' decision, he recognizes that the Teaming Guidelines were applicable to the compensation split and that Ivins had the authority to designate who would be the Servicing and Non-Servicing Advisors. Rojas Decl., Ex. A 142:18-24; 143:13-20; 144:17-145:4.

Subsequently, Kikkoman took its business to a competitor, and the prospective deal was lost.  Ivins Decl. ¶ 10.  The failure to close the deal, worth a total of $24 million dollars in investments with the firm, represented a loss to not only Plaintiff and Grimm, but also to

Povlitz, whose compensation was tied in part to the production achieved by the FAs in her region.  Povlitz Decl. ¶ 8; Rojas Decl., Ex. A 149:18-150:1.

### F. PLAINTIFF'S PERFORMANCE

From the start of his production period at Merrill Lynch (i.e., March 2008), Plaintiff never met the quarterly hurdles outlined in the POA Guide.  Dkt. 45, Williams Decl. ¶ 6; Ivins Decl. ¶ 15.  Plaintiff received a verbal warning around October 2008 from Jennifer Williams, an Associate Director in the Oakland office whose responsibilities included overseeing FA trainee performance and counseling trainees not tracking their targets as set by the POA Guide.  Williams Decl. ¶¶ 2-5, 8; Rojas Decl., Ex. A 79:17-81:2; 163:11-165:23.  Plaintiff testified that, at the time of his hiring, Etheridge mentioned only one target: $15 million in assets in 18 months.  Rojas Decl., Ex. A 56:13-57:4.  Etheridge does not recall saying this to Plaintiff, and Etheridge has indicated that he does not have the authority to modify the performance requirements of the POA Program.  Etheridge Decl. ¶¶ 7-8.  Nor was this alleged target ever communicated to Plaintiff in writing.  Rojas Decl., Ex. A 64:19-65:20.

When Plaintiff failed to improve his performance, Williams issued him a written warning on November 12, 2008.  Williams Decl. ¶ 10.  Plaintiff admits that, prior to this warning, he failed to respond to meeting requests from Williams to meet in late October and early November to discuss his performance.  Rojas Decl., Ex. A 162:8-163:10; 170:10-173:3, Ex. F; Williams Decl. ¶ 9.  Indeed, Plaintiff testified that "whenever I saw e-mails from Jennifer [Williams], I had a habit of ignoring it."  Rojas Decl., Ex. A 190:3-6.  In addition to failing to meet his targets, Plaintiff had ceased participating in the POA program in other ways, like routinely skipping mandatory POA meetings.  Rojas Decl., Ex. A 67:9-70:23; 181:19-183:7; Williams Decl. ¶ 10.  Plaintiff admits that he failed to attend these meetings, but explains that he understood them to be optional based on "chatter" around the office.  Rojas Decl., Ex. A 67:9-70:23.

In her November 12, 2008 written warning, Williams stated:

> [Y]out are not tracking to meet your POA Performance Hurdles, you are not reporting to the office to work and not providing a valid explanation of the reason, and you are not attending mandatory meetings and events.

Rojas Decl., Ex. A 173:4-179:8; Ex. G; Williams Decl. ¶¶ 10-12.  Plaintiff refused to sign the warning.  Id.  Nevertheless, Plaintiff testified that his relationship with Williams "never went below a professional level."  Rojas Decl., Ex. A 44:2-45:2.

By December 8, 2008, Plaintiff was still failing to meet his performance targets.  Specifically, he was required to have a minimum of 50,000 Production Credits ("PCs") or $2,800,000 in Annualized Assets by that date.  Rojas Decl., Ex. A 66:9-67:8; Ivins Decl. ¶¶ 14, 15.  However, Plaintiff was only at 5,274 PCs and $306,182.69 in Annualized Assets, short of the minimum requirements.  Rojas Decl., Ex. A 75:25-78:13; Ivins Decl. ¶¶ 14, 15.  In addition, Plaintiff continued to miss meetings and ignored an assignment given to all FAs in the office.  Rojas Decl., Ex. A 188:3-190:6; 193:19-194:21, Ex. H; Williams Decl. ¶ 13.

Ivins issued a final written warning to Plaintiff on December 11, 2008.  Rojas Decl., Ex. A 207:7-210:18, Ex. I; Ivins Decl. ¶ 16.  In that final warning, Plaintiff was informed that if he did not improve his performance in the next fourteen days, his employment would be terminated without further discussion or warning.  Id.  Again, Plaintiff refused to sign the warning.  Id.

### G.   PLAINTIFF'S TERMINATION

Also in December 2008, Defendant conducted a nationwide review of all FA trainees with a length of service greater than six months.  Ivins Decl. ¶ 17.  Defendant decided to terminate any trainee who did not meet certain performance criteria.  Id.  On December 12, 2008, Povlitz was directed by her superiors to terminate a number of FA trainees in her region, including Plaintiff, by December 17, 2008.  Povlitz Decl. ¶ 10, Ex. A; Ivins Decl. ¶ 17.  Caucasian FA trainees in Povlitz's region were also terminated, including two Caucasian trainees in the Oakland office.  Ivins Decl. ¶ 21; Povlitz Decl. ¶ 12; Dkt. 40, Belanoff Decl. ¶ 16.

After reviewing the December 12, 2008 directive, Povlitz and Ivins coordinated on how to communicate the termination decision to the FA trainees that had been identified for termination.  Ivins Decl. ¶ 19; Povlitz Decl. ¶ 11.  Ivins then met with Plaintiff on December

19, 2008, explained the nationwide review, and informed him of his termination on that basis. Ivins Decl. ¶ 20; Rojas Decl., Ex. A 210:24-212:18.

### H. PLAINTIFF COMPLAINS TO MERRILL LYNCH

Throughout Plaintiff's employment, Defendant had anti-harassment and anti-discrimination policies in place. Belanoff Decl. ¶ 2, Ex. A. Plaintiff testified that he was aware of the policies and knew that, under the policies, he was obligated to report unlawful behavior. Rojas Decl., Ex. A 51:7-52:19. Yet, Plaintiff did not notify Defendant of his claims of race discrimination and race harassment until nearly a year after his termination, in November 2009. Rojas Decl., Ex. A 231:11-19. Defendant responded by assigning Erik Belanoff, Vice President in the Employee Relations Department, to investigate Plaintiff's claims. Belanoff Decl. ¶¶ 5-6. As part of the investigation, Belanoff interviewed Mesinger, Ivins, and Williams. Id. ¶¶ 7-12. Belanoff also reviewed information relating to the firm's national review of FA trainees and the resulting terminations. Id. ¶¶ 14-15. Belanoff concluded that Plaintiff had been terminated as part of the firm's nationwide review of trainees, and that the termination was not the result of racial bias. Id.[1]

## II. PROCEDURAL HISTORY

Plaintiff, who is African American, filed this pro se action on January 5, 2010, bringing claims against Defendant for race discrimination and race harassment under Title VII and FEHA. Plaintiff bases his claims on the following events: (1) Mesinger's instructions to modify his customer mailing to exclude religious language; (2) his assignment as the Non-

---

[1] In November 2008, Plaintiff filed in this Court an action against another of his former employers, Morgan Stanley, alleging race discrimination and sexual harassment. That action was also before the undersigned. Strong v. Morgan Stanley Dean Witter, C 08-5209 SBA. During his April 21, 2009 deposition in that action, Plaintiff was questioned about the reasons for his termination from Merrill Lynch, to which he responded: "[t]here was no reason for me to think it was due to my race." Rojas Decl., Ex. J 169:19-170:14. Plaintiff also testified regarding the circumstances surrounding the Kikkoman deal: "[t]hey were planning to invest with them, [b]ut I think we argued too much among ourselves at Merrill and we took too long to get back with them and took too long to say 'Hey, let's do this,' that they went with another firm altogether." Id. 206:10-207:8. Moreover, Plaintiff testified in this litigation that his testimony given in the Morgan Stanley case was truthful. Rojas Decl., Ex. A 16:13-17:1.

Servicing Advisor to the Kikkoman deal; (3) the failure of the Kikkoman deal; and (4) his performance counseling by Williams and subsequent termination. Rojas Decl., Ex. A 82:5-84:12; 145:20-25; 219:14-22; 221:19-222:15; 225:8-226:8. Furthermore, Plaintiff identifies Povlitz as a wrongdoer, claiming that she instructed Mesinger, Ivins, and Williams to single out Plaintiff, make a case against him, and terminate him because of his race. Id. 100:10-25; 144:5-145:25; 221:21-224:11. Plaintiff also asserts that Ivins, at Povlitz's direction, sabotaged the Kikkoman deal on account of Plaintiff's race. Id. 149:5-17.

Now, Defendant has moved for summary judgment or, in the alternative, partial summary judgment on Plaintiff's claims.

## III. **LEGAL STANDARD**

Rule 56(c) of the Federal Rules of Civil Procedure authorizes summary judgment if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). The moving party bears the initial burden of demonstrating the basis for the motion and identifying the portions of the pleadings, depositions, answers to interrogatories, affidavits, and admissions on file that establish the absence of a triable issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). If the moving party meets this initial burden, the burden then shifts to the non-moving party to present specific facts showing that there is a genuine issue for trial. Fed.R.Civ.P. 56(e); Celotex, 477 U.S. at 324; Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986).

Evidence submitted in support of or in opposition to a motion for summary judgment must be admissible under the standards articulated in Federal Rule of Civil Procedure 56(e). Orr v. Bank of America, NT & SA, 285 F.3d 764, 773 (9th Cir. 2002); Civil Local Rule 7-5 ("Factual contentions made in support of or in opposition to any motion must be supported by an affidavit or declaration and by appropriate references to the record" and "must conform as much as possible to the requirements of FRCivP 56(e)"). Furthermore, a pro se litigant is held to the same standard in responding to a motion for summary judgment as a represented party.

1  Jacobsen v. Filler, 790 F.2d 1362, 1364-66 (9th Cir. 1986); United States v. Bell, 27 F.Supp.2d
2  1191, 1197 n.4 (E.D. Cal. 1998).
3        "On a motion for summary judgment, 'facts must be viewed in the light most favorable
4  to the nonmoving party only if there is a 'genuine' dispute as to those facts.'" Ricci v.
5  DeStefano, -- U.S. --, 129 S.Ct. 2658, 2677 (2009) (quoting Scott v. Harris, 550 U.S. 372, 380
6  (2007)).  An issue of fact is "material" if, under the substantive law of the case, resolution of
7  the factual dispute might affect the outcome of the claim.  See Anderson, 477 U.S. at 248.
8  Factual disputes are genuine if they "properly can be resolved in favor of either party." Id. at
9  250.  Accordingly, a genuine issue for trial exists if the non-movant presents evidence from
10 which a reasonable jury, viewing the evidence in the light most favorable to that party, could
11 resolve the material issue in his or her favor.  Id.  "If the evidence is merely colorable, or is not
12 significantly probative, summary judgment may be granted." Id. at 249-50 (internal citations
13 omitted).

## IV.   ANALYSIS

Plaintiff brings his race discrimination and race harassment claims under FEHA and Title VII.  FEHA mirrors Title VII law, and thus the same analysis applies to both the state and federal claims.  See Bradley v. Harcourt, Brace and Co., 104 F.3d 267, 270 (9th Cir. 1996); Reno v. Baird, 18 Cal.4th 640, 647 (1998).

### A.   RACE DISCRIMINATION

To state a prima facie case of race discrimination, Plaintiff must show that:  (1) he belongs to a protected class; (2) he performed his job satisfactorily; (3) he was subject to an adverse employment action; and (4) similarly-situated individuals outside his protected class were treated more favorably.  McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973); Surrell v. Cal. Water Serv. Co., 518 F.3d 1097, 1105-06 (9th Cir. 2008).  Failure to establish any essential element of a case is grounds for summary judgment.  Celotex, 477 U.S. at 322. Because Plaintiff bears the burden of establishing a prima facie case, Defendant need only show that there is "an absence of evidence to support [Plaintiff's prima facie] case." Id. at 323.

If Plaintiff is able to demonstrate a prima facie case, the burden then shifts to Defendant to articulate a legitimate, nondiscriminatory reason for its actions. Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 253-54 (1981). Once Defendant states its reason, the burden shifts back to Plaintiff to show that this reason is a pretext for discrimination. Id.

### 1. Prima Facie Case of Discrimination

Here, Plaintiff has not established a prima facie case of race discrimination. First, Plaintiff has submitted no evidence to satisfy prong two, i.e., that he performed his job satisfactorily. To the contrary, the record shows that he never met the minimum requirements outlined in the POA Guide. While Plaintiff claims that he was given only one target by Etheridge when he was hired, the evidence shows that Etheridge did not have the authority to change the performance requirements of the POA program, which are set at a corporate level. In addition, Plaintiff admits that, over the course of his employment, he stopped participating in POA meetings and outright ignored multiple emails, including meeting requests to discuss his performance, from Williams. Rojas Decl., Ex. A 188:3-190:6; 193:19-194:21.

Second, Plaintiff has submitted no evidence to satisfy prong four: that similarly situated individuals outside his protected class were treated more favorably. Specifically, Plaintiff admitted during his deposition that other than sheer speculation, he has no reason to believe that Povlitz actually directed any of the alleged discriminatory actions, including his termination. Id. 84:13-90:4. Even if Povlitz had directed the other managers to act, Plaintiff has proffered no evidence that she was motivated by racial animus. Plaintiff admits that he had virtually no interaction with Povlitz, he has never heard her make any racial comments, and has no basis to believe that she treated any employees more or less favorably based on race. Id. 87:7-24. Indeed, the sole basis for Plaintiff's current assertion that Povlitz discriminated against him based on race is that he was the only African American person involved in the

- 10 -

Kikkoman deal, and that he can think of no other reason that Povlitz would "single out" Plaintiff other than his race. Id. 84:13-90:4.[2]

Furthermore, Plaintiff cannot establish that he was treated differently from others outside of his race because he was terminated alongside Caucasian FA trainees in the region, including two in the Oakland office. Ivins Decl. ¶ 21; Povlitz Decl. ¶ 12; Belanoff Decl. ¶ 16. Moreover, Plaintiff testified that he had no reason to believe that Povlitz singled out any other African American employees in the Oakland office. Id. 84:13-90:4.

In fact, the only evidence that Plaintiff has submitted along with his opposition is the declaration of Edem Akpokli, and Plaintiff fails to actually cite or otherwise rely on that declaration in his opposition. Dkt. 55, Akpokli Decl. In his declaration, Akpokli states that he was an employee at Merrill Lynch "during the time of Plaintiff's employment." Id. at 1. Yet, Akpokli does not state the dates he worked for Merrill Lynch, the position he held, or where he worked. Nor does Akpokli aver that he has any knowledge of Plaintiff's performance at Merrill Lynch. Nonetheless, Akpokli asserts that he is a "witness to the culture at Merrill Lynch for Financial Advisors relative to various training programs." Id. at 1. Furthermore, he asserts that it "was understood that an FA had, depending on his or her program, 18-24 months to meet the goals set by the company," and concludes that "[a]ny notion that Plaintiff was neglecting his job due to not keeping a rigid schedule is not true." Id. at 3. Even in viewing this evidence in the light most favorable to Plaintiff, it is vague, highly conclusory, lacking apparent foundation and, therefore, minimally probative. It fails to create a genuine issue of

---

[2] While Plaintiff speculates that Grimm, the Caucasian FA with whom he worked on the Kikkoman deal, was treated more favorably by being designated the Servicing Advisor to that deal, Plaintiff has proffered no evidence that Grimm was "similarly situated in all material respects," so as to support his prima facie case of discrimination. See Moran v. Selig, 447 F.3d 748, 755 (9th Cir. 2006) ("[i]n order to show that the 'employees' allegedly receiving more favorable treatment are similarly situated … the individuals seeking relief must demonstrate, at the least, that they are similarly situated to those employees in all material respects"); Vasquez v. County of Los Angeles, 349 F.3d 634, 641 (9th Cir. 2003) ("individuals are similarly situated when they have similar jobs and display similar conduct"); Hollins v. Atlantic Co., Inc., 188 F.3d 652, 659 (6th Cir. 1999) (holding that, to be similarly situated, an employee must have the same supervisor, be subject to the same standards, and have engaged in the same conduct). In fact, according to Plaintiff, Grimm had more seniority at Merrill Lynch than Plaintiff. Pl.'s Opp. at 3-4.

material fact regarding the unsatisfactory nature of Plaintiff's performance at Merrill Lynch. See Taylor v. List, 880 F.2d 1040, 1045 (9th Cir. 1989) ("A summary judgment motion cannot be defeated by relying solely on conclusory allegations unsupported by factual data.").[3]

In sum, Plaintiff has failed to offer evidence sufficient to establish a prima facie case of race discrimination under either Title VII or FEHA, so as to withstand Defendant's motion for summary judgment as to these claims. Even assuming that Plaintiff has established a prima facie case, Defendant has offered legitimate, non-discriminatory reasons for its employment actions, and Plaintiff has not met his burden of demonstrating pretext, as explained below.

### 2. Legitimate, Non-Discriminatory Reasons

With respect to Plaintiff's inclusion of religious language in his customer mailings, the evidence shows that Defendant had a legitimate business concern that the language Plaintiff was using could expose it to liability for inappropriately using religion to entice prospective clients, and that Defendant acted out of that concern. Mesinger Decl. ¶¶ 2-6. As for the Kikkoman deal, the evidence shows that Ivins made a managerial decision to apply the firm's standard written guidelines with respect to FAs teaming on new business. Consistent with her managerial discretion, Ivins determined who would be the Servicing and Non-Servicing Advisors if the deal materialized. Plaintiff admits that the Teaming Guide was applicable to the deal and, further, that it was in management's discretion to assign him as the Non-Servicing Advisor. Rojas Decl., Ex. A. 142:18-24; 143:13-20; 144:17-145:4. Furthermore, Plaintiff's present assertion that Ivins sabotaged the Kikkoman deal out of discriminatory animus is undermined by his prior testimony in the Morgan Stanley litigation, where he testified that the deal was lost because "we argued too much among ourselves at Merrill and we took too long to get back with them and took too long to say 'Hey, let's do this,'" and, as a result, "they went with another firm altogether." Id., Ex J 206:10-207:8.

---

[3] Defendant has objected to the Akpokli declaration on various evidentiary grounds. However, even if this evidence is deemed admissible, and is considered in the light most favorable to Plaintiff, as the Court has done here, Akpokli's conclusory and unsupported assertions still fail to raise any genuine issue of material fact in support of Plaintiff's discrimination claim. Therefore, Defendant's evidentiary objections are DENIED as MOOT.

Next, the evidence offered by Defendant supports the conclusion that Plaintiff failed to meet the quarterly targets outlined in the POA Guide. Plaintiff does not dispute that he failed to meet the POA targets. Rather, he claims that Etheridge verbally informed him he had 18 months to meet those targets. Rojas Decl., Ex. A 56:13-57:4. However, Etheridge does not recall saying this to Plaintiff, and he declared that he does not have the authority to modify the performance requirements of the POA Program. Etheridge Decl. ¶¶ 7-8. Thus, the Court finds Plaintiff's assertions regarding the 18 month timeframe to be unpersuasive. Villiarimo v. Aloha Island Air, Inc., 281 F.3d 1054, 1061 (9th Cir. 2002) ("this court has refused to find a genuine issue where the only evidence presented is uncorroborated and self-serving testimony") (internal quotations omitted).[4] Additionally, Plaintiff admits that he ignored emails and meeting requests from his supervisor. Put simply, Defendant has shown that it had a legitimate business reason for counseling Plaintiff regarding his performance deficiencies and for ultimately terminating him based on those deficiencies and the nationwide FA trainee review.

All of the above reasons are legitimate, non-discriminatory reasons for the allegedly discriminatory actions identified by Plaintiff.

### 3. Pretext

As indicated, where the employer presents legitimate reasons for the challenged action, "the burden shifts back to the employee to demonstrate a triable issue of fact as to whether such reasons are pretextual." Pardi v. Kaiser Found. Hosps., 389 F.3d 840, 849 (9th Cir. 2004). Evidence to show pretext must be both specific and substantial in order to overcome the articulated legitimate reasons put forth by the employer. See Cornwell v. Electra Cent. Credit Union, 439 F.3d 1018, 1029 (9th Cir. 2006).

Here, Plaintiff has failed to proffer any evidence of pretext, other than his unsupported speculation that he was "singled out" because of his race. The speculative nature of Plaintiff's claim is clear from his deposition testimony:

---

[4] For the reasons indicated above, the Akpokli declaration is also insufficient to support Plaintiff's allegations regarding the 18 month timeframe.

- 13 -

> Q. And can you tell me all of the reasons that you believe Jennifer Povlitz was instructing management to build a case against you or single you out because of your race?
>
> A. I can't give you a reason why.
>
> Q. So you have no reason to believe that it was related to your race?
>
> A. I believe it was. That's the only thing that comes to mind, that it was based on race.
>
> Q. So why do you believe that it was based on your race?
>
> A. I mean, what other reasons would she have to single me out other than I'm tall or maybe I'm male. I'm not sure. That's what I'm saying. You don't know what is in someone's mind, but that is what initially came to mind.

Rojas Decl., Ex. A 86:23-87:13. Furthermore, Plaintiff does not even address in his opposition his contradictory deposition testimony given in his prior lawsuit against Morgan Stanley: that he had no reason to believe that his termination from Merrill Lynch was due to his race, and that he and his colleagues lost the Kikkoman deal because they argued too much amongst themselves and delayed the deal.

In sum, Plaintiff has made no credible argument, much less presented any evidence, to raise a genuine issue as to any material fact respecting his discrimination claims. Thus, summary judgment is GRANTED in Defendant's favor on Plaintiff's Title VII and FEHA race discrimination claims.

### B. RACE HARASSMENT

To establish a prima facie case of race harassment, Plaintiff must show: (1) Defendant subjected him to verbal or physical conduct based on his race; (2) the conduct was unwelcome; and (3) the conduct was sufficiently severe or pervasive to alter the conditions of his employment and create an abusive working environment. Surrell, 518 F.3d at 1108. In determining whether challenged conduct constitutes actionable harassment, "courts must consider all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Faragher v. City of Boca Raton, 524 U.S. 775, 786 (1998) (internal quotations omitted).

1    Here, Plaintiff admits that he never heard Povlitz use racial slurs or otherwise make any
2 comments about his or anyone else's race. Rojas Decl., Ex. A 87:7-24. Plaintiff also testified
3 that Povlitz, Mesinger, and Williams interacted with him in a professional manner. Id. 40:13-
4 41:1; 41:14-42:7; 44:2-45:2;101:10-20. Furthermore, Plaintiff's prior testimony in the Morgan
5 Stanley action undermines his current allegations regarding race-based harassment at Merrill
6 Lynch.

7    Just as with his discrimination claim, Plaintiff has proffered no evidence to raise any
8 genuine issue of material fact with respect to his harassment claim. Again, aside from his
9 reference to his status as the only African American on the Kikkoman deal, his opposition
10 makes no further mention of his race, and certainly cites no evidence connecting his race to any
11 allegedly harassing acts. Indeed, Plaintiff testified that, in his experience, the employees
12 involved in the Kikkoman deal never used racial slurs or made any comments about his or any
13 other person's race. Id. 89:15-24. Thus, like his discrimination claim, Plaintiff's harassment
14 claim cannot survive summary judgment. See Mitchel v. General Electric Company, 689 F.2d
15 877, 879 (9th Cir. 1982) (employee's "unsubstantiated and conclusory allegations would be
16 insufficient to oppose defendants' evidentiary showing under Fed. R. Civ. P. 56(e)"); Wilson v.
17 International Business Machines Corp., 62 F.3d 237, 241 (8th Cir. 1995) (to survive summary
18 judgment the non-moving party must substantiate his allegations with sufficient probative
19 evidence, not "mere speculation, conjecture, or fantasy").

20    At bottom, Plaintiff has failed to provide any evidence that he was subjected to conduct
21 based on his race, other than his speculation that he was being "singled out" because he is
22 African American. As such, summary judgment is GRANTED in Defendant's favor on
23 Plaintiff's Title VII and FEHA race harassment claims.

## V. CONCLUSION

25    For the forgoing reasons, IT IS HEREBY ORDERED that Defendant's Motion for
26 Summary Judgment is GRANTED in its entirety. This Order terminates Docket 38.
27    ///
28    ///

1 |     IT IS SO ORDERED.

2 | Dated: 1/5/11                      _____

3 |                                      SAUNDRA BROWN ARMSTRONG
United States District Judge